Andrew GUYTON, Plaintiff,

v.

NOVO NORDISK, INC., Defendant.

CASE NO. CV 15–00009 MMM (AGRx)

United States District Court,
C.D. California.

Signed 12/16/2015

Alvin L. Pittman, Alvin L. Pittman Law Offices, Los Angeles, CA, for Plaintiff.

Erica C. Parks, Lauren Marie Kulpa, Max C. Fischer, Sidley Austin LLP, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE

On September 5, 2014, Andrew Guyton sued Novo Nordisk, Inc. ("Novo Nordisk") and various fictitious defendants, alleging claims of race and age discrimination, as well as retaliation, under California's Fair Employment and Housing Act, Government Code § 12900 et seq. ("FEHA"); he also pled a claim for wrongful discharge in violation of public policy.[1] Novo Nordisk

was served on December 5, 2014,[2] and timely removed the action to federal court on January 2, 2015, invoking the court's diversity jurisdiction.[3]

On November 16, 2015, Novo Nordisk moved for summary judgment.[4] Guyton opposes the motion.[5]

## I. FACTUAL BACKGROUND

### A. Novo Nordisk and Its Relevant Policies

Novo Nordisk is a pharmaceutical company that develops, markets, and sells drugs designed to treat patients suffering from Type I and Type II diabetes.[6] As described by one of Novo Nordisk's managers, Jill Sutton, Novo Nordisk's sales professionals and sales managers are organized into regions, which in turn are divided up sales districts. The sales districts are divided into sales territories.[7] Regions are overseen by "regional sales directors," while sale districts are overseen by "district managers."[8] Field sales professionals—who are responsible for marketing and selling products to health care professionals ("HCPs")—are assigned to a particular sales territory.[9] Within Novo Nordisk, field sales professionals are referred to as Diabetes Care Specialists ("DCSs").[10]

1. Declaration of Lauren M. Kulpa in Support of Defendant's Notice of Removal ("Kulpa Decl."), Docket No. 3 (Jan. 2, 2015), Exh. 2 ("Complaint").

2. Kulpa Decl., Exh. 1 ("Summons").

3. Notice of Removal, Docket No. 1 (Jan. 2, 2015).

4. Defendant Novo Nordisk, Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment ("Motion"), Docket No. 25-2 (Nov. 16, 2015).

5. Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion

for Summary Judgment ("Opposition"), Docket No. 28 (Nov. 23, 2015).

6. Declaration of Jill Sutton in Support of Novo Nordisk Inc.'s Motion for Summary Judgment ("Sutton Decl."), Docket No. 25-8 (Nov. 16, 2015), ¶ 3.

7. Id.

8. Id.

9. Id., ¶ 4.

10. Id.

In marketing and selling products to HCPs, DCSs regularly make certain expenditures for the benefit of HCPs; these include buying them meals and gifts.[11] Partly because of this, pharmaceutical companies operating in the United States are subject to certain laws that restrict their access to and interactions with HCPs. One of these is an "anti-kickback law," which requires that pharmaceutical companies trace and publicly disclose their expenditures associated with HCP interactions.[12] Novo Nordisk asserts that it is committed to complying with these regulations,[13] and identifies two handbooks (a 2011 "U.S.Code of Business Conduct" and a 2013 "Business Ethics Policy") that are given to Novo Nordisk employees. These handbooks reference relevant laws and summarize thirteen different laws, regulations, and administrative guidelines.[14]

Because of the laws and regulations that govern its sales efforts, Novo Nordisk has adopted written policies that place limits on the manner in which DCSs may interact with HCPs. One of these policies requires that DCSs limit the frequency, amount, and type of expenditures they make in visiting HCPs, both to comply with relevant regulations and to avoid the appearance of impropriety.[15] The policies also require that DCSs record detailed information concerning each expenditure made, including the amount and type of expenditure and the name of all individuals—both HCPs and Novo Nordisk employees—present at each meal or other activity related to the expenditure; these records are publicly disclosed.[16] Additionally, Novo Nordisk policy mandates that DCSs enter their field sale expenses on a bi-weekly schedule.[17] It also requires that DCSs record a log of each sales call they make to HCPs; this allows management to match recorded expenditures with recorded calls to help ensure accuracy.[18] Guyton does not dispute that Novo Nordisk has enacted these written policies; he asserts, however, that Novo Nordisk is not genuinely committed to regulatory compliance, that management places "blind emphasis on selling," and that it encourages DCSs to engage in sales practices that violate the law and its written policies.[19]

## B. Guyton's Employment and Disciplinary Issues

Novo Nordisk hired Guyton as a DCS in March 2007.[20] During his approximately seven year tenure at the company, Guyton failed on certain occasions to comply with several of Novo Nordisk's policies.[21] Guyton's call logs from January 2012 through May 2013 reflect numerous instances in

---

11. Defendant Novo Nordisk's Statement of Uncontroverted Facts and Conclusions of Law ("SUF"), Docket No. 25–1 (Nov. 16, 2015), ¶ 1; Plaintiff's Response to Defendant Novo Nordisk, Inc.'s Alleged Statement of Uncontroverted Facts and Conclusions of Law ("Response"), Docket No. 29 (Nov. 23, 2015). The parties dispute the size of these expenditures. Novo Nordisk states that DCSs make "small" expenditures, while Guyton asserts they "regularly ma[k]e large and small expenditures."

12. SUF, ¶ 2; Response, ¶ 2.

13. Sutton Decl., ¶ 7.

14. *Id.*, Exh. B ("U.S.Code of Business Conduct"), at 11, 26–28; *id.*, Exh. C ("Business Ethics Policy"), 4–12.

15. SUF, ¶ 4; Response, ¶ 4.

16. SUF, ¶ 5; Response, ¶ 5.

17. SUF, ¶ 6; Response, ¶ 6.

18. SUF, ¶¶ 10–11; Response, ¶¶ 10–11.

19. Response, ¶ 3.

20. SUF, ¶ 19; Response, ¶ 19.

21. SUF, ¶ 20; Response, ¶ 20.

which a sales call was not logged the day the call was made, as required by policy.[22] In August 2012 alone, for example, Guyton logged more than forty sales calls late; ten of these were entered at least two weeks late.[23] Between October 2012 and the first half of November 2012, Guyton logged more than 100 sales calls at least two weeks late.[24] Between March 6 and May 24, 2013, Guyton logged more than seventy-five calls late; approximately thirty were entered at least a week late.[25] In addition to logging calls late, Guyton also failed to comply with Novo Nordisk's policy requiring that DCSs record sales expenses on a bi-weekly basis. On April 9, 2012, for example, Guyton entered more than thirty field sales expenditures that he had made over forty-five days earlier.[26] Likewise, on July 19, 2012, Guyton entered more than twelve field sales expenditures, all of which he had incurred at least three months earlier.[27] In October and November 2012, Guyton's expense reports reflect at least five sales expenditures that Guyton had incurred at least thirty days earlier.[28] During this period, no other employee reporting to Guyton's supervisor, Sutton, consistently fell behind in logging calls and recording expenses.[29]

In November 2012, Guyton was placed on an "action plan"—a probationary form of discipline at Novo Nordisk.[30] Deanna Canepa, a regional field director who supervised the Southern California district while Sutton was on maternity leave, asserts that Guyton was placed on an action plan "as a result of his continued failure to abide by [Novo Nordisk's] express policies."[31] Guyton does not dispute that he was placed on a disciplinary action plan; he contends, however, that this was not because he had failed to adhere to Novo Nordisk policies, and that his lack of compliance "is a fact gathered retroactively in an effort to support [Novo Nordisk's] discriminatory and retaliatory actions."[32] Nonetheless, the copy of the action plan Guyton received identified two bases for the disciplinary action: his failure to log calls during the work hours the calls were made, and his failure to file expense reports within five days of the end of each bi-weekly period.[33] Guyton testified at his deposition that he understood that the reasons he was placed on an action plan were his failure to record telephone calls to physicians in a timely fashion and his failure to submit timely expense reports.[34] After Guyton was placed on an action plan,

22. SUF, ¶ 21; Response, ¶ 21.

23. SUF, ¶ 22; Response, ¶ 22.

24. SUF, ¶ 23; Response, ¶ 23.

25. SUF, ¶ 24; Response, ¶ 24. The statement of uncontroverted facts asserts that these dates were in 2012 rather than 2013. After reviewing the declarations and exhibits to which the statement cites, however, it is apparent that this is a typographic error.

26. SUF, ¶ 26; Response, ¶ 26.

27. SUF, ¶ 27; Response, ¶ 27.

28. SUF, ¶ 28; Response, ¶ 28.

29. SUF, ¶ 30; Response, ¶ 30.

30. SUF, ¶ 32; Response, ¶ 32.

31. Declaration of Deanna Canepa in Support of Novo Nordisk's, Inc.'s Motion for Summary Judgment ("Canepa Decl."), Docket No. 25–4 (Nov. 16, 2015), ¶ 6.

32. Response, ¶ 32.

33. Canepa Decl., Exh. A ("Action Plan").

34. Declaration of Erica Parks in Support of Novo Nordisk Inc.'s Motion for Summary Judgment, Docket No. 25–7 (Nov. 16, 2015), Exh. A ("Guyton Deposition") at 70:21–71:05 (Q: "In terms of the action plan that was presented to you, what did you—did you understand why Deanna [Canepa] was giving this to you?" Guyton: "Oh yes. It says it clearly." Q: "Okay. And what did you un-

his compliance with Novo Nordisk's policies began to improve; he was taken off the plan in December 2012.[35]

Beginning in March 2013, however, Guyton's compliance with the logging of calls policy worsened. Call log records proffered by Novo Nordisk indicate that between March and May 24, 2013, Guyton entered more than seventy-five sales calls late, including over thirty that were entered at least a week after the call took place.[36] Guyton does not dispute the accuracy of the logs or the fact that he continued to enter sales calls late.[37] On May 29, 2013, Guyton received a written warning from Sutton, which placed him on a "Performance Improvement Plan."[38] The document cites, *inter alia*, Guyton's failure to "record[ ] [calls] at the time the call is made" as a basis for the warning.[39]

### C. Guyton's Application for the Regional Support Manager Position

In July 2012, Novo Nordisk sought to hire a regional support manager for the Southern California region.[40] Stephen Adkins was an associate director at the time who was responsible for interviewing and hiring for the position.[41] Among other qualifications, Adkins expected, as a "threshold requirement," that applicants would have a clear understanding of what the support manager position entailed.[42] Guyton applied, but was not hired for the position. The parties dispute the reason why Guyton was not hired; this dispute is discussed *infra*.

In July 2012—the same month Guyton was interviewed for the regional support manager position—Adkins interviewed two other candidates.[43] One was a Hispanic man under the age of 40; the other was a Caucasian woman whose age the parties dispute.[44] Adkins did not offer the position to either of these candidates.[45] In October 2012, two additional candidates applied for the position and were inter-

---

derstand the reasons to be?" Guyton: "For administrative timeliness.... Specifically expense reports and syncing calls").

**35.** SUF, ¶ 34; Response, ¶ 34.

**36.** Sutton Decl., Exh. G ("Call Logs").

**37.** In response to Novo Nordisk's statement of uncontroverted facts, which asserts that Guyton entered seventy-five calls late during this period, Guyton contends the fact is "disputed." (Response, ¶ 36). He argues that the proposed fact is contradicted by the written warning he received. The court cannot discern the contradiction. The written warning states that "[b]etween 4/29/13 and 5/10/13, there were seven days when you entered calls outside of normal business hour[s] or backdated calls." (Declaration of Andrew Guyton in Opposition to Defendant's Motion for Summary Judgment ("Guyton Decl."), Exh. 13 ("Written Warning")). Although the warning concerns only a twelve-day period in the three-month period referenced in Novo Nordisk's statement of uncontroverted facts, this

does not controvert the fact that more late recording occurred over the course of the relevant period.

**38.** SUF, ¶ 37; Response, ¶ 37.

**39.** Written Warning at 1.

**40.** Declaration of Stephen Adkins in Support of Novo Nordisk, Inc.'s Motion for Summary Judgment ("Adkins Decl."), (Docket No. 25–3 Nov. 16, 2015), ¶ 4.

**41.** *Id.*

**42.** SUF, ¶ 41; Response, ¶ 41.

**43.** SUF, ¶ 51; Response, ¶ 51.

**44.** Novo Nordisk asserts that the female candidate, Christine Maas, was under the age of forty. Guyton asserts that she was over the age of forty.

**45.** SUF, ¶ 54; Response, ¶ 54.

viewed by Adkins.[46] One was Caucasian and under the age of forty; the other, Marcio Orozco, was Hispanic and under the age of forty.[47] Orozco was ultimately hired as the regional support manager.[48]

### D. Guyton's Unsuccessful Transfer Requests

On December 2, 2012, Guyton wrote an email to Canepa in which he requested a transfer to the Downey territory.[49] According to the email exchange proffered by Novo Nordisk, Canepa immediately forwarded Guyton's email to other Novo Nordisk managers asking for their input on the request; she noted that Guyton was currently on an action plan.[50] In response, Rodney Carr, who was at that point a district business manager, stated that he was "not comfortable and would not like to

transfer a representative who is currently on an action plan into [his] open territory."[51] According to several Novo Nordisk managers, this is consistent with Novo Nordisk's policy of not considering an employee's application for an open position—including a transfer—if the employee is being formally disciplined at the time; this includes having been placed on an action plan.[52] Guyton does not appear to dispute the existence of this policy.[53]

In either March or May 2013, Guyton contacted Carr to request a transfer to an open sales position in the West Hollywood territory.[54] In May 2013, Carr contacted Myo Tun, the regional business director, to discuss Guyton's interest in the transfer.[55] Tun told Carr that Guyton was currently on a performance improvement program

---

46. SUF, ¶ 56; Response, ¶ 56.

47. SUF, ¶ 57, 58; Response, ¶ 57, 58.

48. SUF, ¶ 58; Response, ¶ 58.

49. SUF, ¶ 65; Canepa Decl., Exh. B ("Transfer Email Exchange").

50. Transfer Email Exchange.

51. *Id.*

52. See Carr Decl., ¶ 4 ("At [Novo Nordisk], employees who wish to be considered for an open position must have the approval of their current manager. Likewise, in order to transfer to an open position, internal candidates must be in good standing with [Novo Nordisk] and cannot be subject to ongoing formal discipline, such as an action plan or a performance improvement plan"); Adkins Decl., ¶ 3 ("In order to be considered for an open position . . . internal applicants must be in good standing with the Company and, therefore, cannot be subject to ongoing formal discipline, such as an action plan or performance improvement plan"); Sutton Decl., ¶ 29 ("As a matter of practice, employees must be in good standing in order to be eligible to apply internally for open positions and not be subject to ongoing formal discipline, such as an action or performance im-

provement plan"); Canepa Decl., ¶ 7 ("[I]nternal candidates must be in good standing with the Company and, therefore, are not eligible to transfer if they are subject to ongoing formal discipline, such as an action plan or performance improvement plan").

53. Although Guyton purports to dispute the existence of the policy (Response, ¶ 64), his description of the dispute demonstrates that no real dispute exists. Guyton states: "[Novo Nordisk] showed that it would promote rather than discipline persons who were admittedly DISHONEST, who willfully and repeatedly 'Falsified Records.'" (*Id.*) Guyton thus appears to take issue with Novo Nordisk's failure to discipline certain individuals who allegedly should have been disciplined. He does not demonstrate that individuals who *had* been formally disciplined were nonetheless transferred to an open position, however. For that reason, he does not raise triable issues as to whether Novo Nordisk required that an employee be in good standing as a prerequisite to transfer.

54. Carr states that the conversation occurred in May 2013. (Carr Decl., ¶ 6). Guyton asserts it took place in March 2013. (Guyton Decl., ¶ 71).

55. SUF, ¶ 70; Response, ¶ 70.

or was about to be placed on one.[56] Carr decided not to transfer Guyton to the West Hollywood territory because he either was or was about to be placed on a performance improvement program and therefore was ineligible to be transferred.[57]

### E. Guyton's Leave of Absence and Resignation

On June 7, 2013, Guyton took a leave of absence from work.[58] On January 7, 2014, six months after he took his leave of absence, Guyton secured a different job and resigned from Novo Nordisk.[59]

## II. DISCUSSION

### A. Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.PROC. 56. A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e)(2). Evidence presented by the parties at the summary judgment stage must be admissible. FED.R.CIV.PROC. 56(e)(1). In reviewing the record, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

### B. Legal Standard Governing FEHA Claims

FEHA prohibits employers from discriminating and/or retaliating against employees on certain enumerated grounds. CAL. GOV'T CODE § 12940(a), (h). Section § 12940(a) declares it unlawful for an employer to refuse to hire, to discharge, or to discriminate against the person in compensation or in terms of, conditions, or privileges of employment, on a number of grounds, including race and age. Section 12940(h) declares that it is an unlawful employment practice for "any employer ..., or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." CAL. GOV'T CODE § 12940(h). "This

---

56. SUF, ¶ 70; Response, ¶ 70.

57. SUF, ¶ 71; Response, ¶ 71.

58. SUF, ¶ 76; Guyton Deposition, 145:25–146:3.

59. SUF, ¶ 77; Response, ¶ 77.

enactment aids enforcement of the FEHA and promotes communication and informal dispute resolution in the workplace." *Miller v. Dep't of Corr.*, 36 Cal.4th 446, 472, 30 Cal.Rptr.3d 797, 115 P.3d 77 (2005) (citing *Flait v. North American Watch Corp.*, 3 Cal.App.4th 467, 476–77, 4 Cal.Rptr.2d 522 (1992)).

■ In evaluating FEHA discrimination and retaliation claims, California courts look to federal precedent governing analogous federal laws. See *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes.... In particular, California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination ... based on a theory of disparate treatment" (citations omitted)); *Flait*, 3 Cal.App.4th at 475–76, 4 Cal.Rptr.2d 522 ("CFEHA prohibits an employer from terminating any employee, including at-will

employees, for attempting to comply with its provisions forbidding racial, sexual or other forms of job harassment. Lawsuits claiming retaliatory employment termination in violation of CFEHA are analogous to federal Title VII claims, and are evaluated under federal law interpreting Title VII cases").

Thus, a plaintiff can establish a prima facie case of discrimination either by adducing direct evidence of discriminatory intent, or by satisfying his burden under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[60] See *Vasquez*, 349 F.3d at 640 ("For a prima facie case, Vasquez must offer evidence that 'give[s] rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent"); cf. *Guz*, 24 Cal.4th at 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 ("This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved

**60.** The Supreme Court has stated that if a plaintiff adduces direct evidence of discrimination, the burden shifting test of *McDonnell Douglas* is not applicable. See *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (noting that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination"). The Ninth Circuit, however, views direct evidence as an alternative means for a plaintiff to establish a prima facie case under *McDonnell Douglas*. See, e.g., *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir.2003) (stating that "[f]or a prima facie case," plaintiff must offer evidence supporting an inference of unlawful discrimination, "either through the framework set forth in *McDonnell Douglas* ... or with direct or circumstantial evidence of discriminatory intent"); *Lowe v. City of Monrovia*, 775 F.2d 998, 1007 (9th Cir.1985) ("Because Lowe has met the four-part *McDonnell*

*Douglas* requirements and alternatively because she has provided direct and circumstantial evidence of discriminatory intent, she established a prima facie case of disparate treatment on the basis of race"); see also *Smith v. United Parcel Serv., Inc.*, 433 Fed. Appx. 623, 625 (9th Cir. May 20, 2011) (Unpub.Disp.) (applying *Vasquez*); *Ujhelyi v. Vilsack*, No. CV 12 04282 JSW, 2014 WL 4983550, *9 (N.D.Cal. Oct. 6, 2014) (same); *McDaniel v. Donahoe*, No. 12–cv–05944, 2014 WL 4639918, *4 (N.D.Cal. Sept. 17, 2014) ("The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas* or by more direct evidence of discriminatory intent," quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994)). Because Guyton has not adduced direct evidence of discrimination, the court need not address this apparent dichotomy.

circumstantially").[61] The McDonnell Douglas framework also applies to retaliation claims. See *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1143 (9th Cir.2003) ("For purposes of summary judgment, we analyze Liu's Title VII and FEHA retaliation claim under the *McDonnell Douglas* burden shifting standard").

In *McDonnell Douglas Corp.*, the Supreme Court held that plaintiff bears the initial burden of establishing a prima facie case of discrimination or retaliation. If plaintiff succeeds in proving a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory or nonretaliatory reason for the employment action. Should defendant carry this burden of production, the burden of proof shifts back to plaintiff to demonstrate that a material question of fact exists concerning whether defendant's asserted reason is the true reason or a mere pretext. *McDonnell Douglas Corp.*, 411 U.S. at 802, 804, 93 S.Ct. 1817. See also *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Thus, a plaintiff seeking to defeat summary judgment must establish a prima facie case and, once defendant has articulated a legitimate, nondiscriminatory or nonretaliatory reason for its actions, raise triable issues of fact as to whether the articulated reason is pretextual. *Sischo-Nownejad v. Merced Community College District*, 934 F.2d 1104, 1110 (9th Cir. 1991), superseded by statute on other grounds as recognized in *Dominguez–Curry v. Nevada Transp. Dept.*, 424 F.3d 1027 (9th Cir.2005); see also *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917–18 (9th Cir.1997) ("To ... survive summary judgment, [plaintiff] must produce enough evidence to allow a reasonable factfinder to conclude either: (a) that the alleged reason for [plaintiff's] discharge was false, or (b) that the true reason for his discharge was a discriminatory one"). "Very little" evidence need be adduced to make out a prima facie case. *Sischo–Nownejad*, 934 F.2d at 1111 (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985), as amended, 784 F.2d 1407 (1986)).

McDonnell Douglas, a refusal to hire case, held that a plaintiff could establish a prima facie case "by showing (i) that he belong[ed] to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The Court cautioned against rigid application of this test, however, noting that "facts necessarily will vary in [discrimination] cases, and [that its] specification ... of the prima facie proof required from [plaintiff] [would] not necessarily [be] applicable in every respect to differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. 1817.

Courts evaluating other types of alleged discrimination claims have thus

---

**61.** See also, e.g., *Cordova v. State Farm Insurance Companies*, 124 F.3d 1145, 1148 (9th Cir.1997) ("To establish a prima facie case, a plaintiff must offer evidence that 'give[s] rise to an inference of unlawful discrimination.' ... 'The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas* ..., or by more direct evidence of discriminatory intent' "); *Wallis*, 26 F.3d at 889 ("The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas Corp.* ... or by more direct evidence of discriminatory intent").

made various adjustments to the *McDonnell Douglas* formulation. In *Godwin v. Hunt Wesson,* 150 F.3d .1217 (9th Cir. 1998), for example, the Ninth Circuit held that a plaintiff had established a *prima facie* case of sex discrimination under FEHA by establishing that "(1) she belong[ed] to a protected class, (2) she [had been] performing according to her employer's legitimate expectations, (3) she [had] suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Id.* at 1220.

The California Supreme Court synthesized these formulations into a generalized test in *Guz,* 24 Cal.4th 317, 100 Cal. Rptr.2d 352, 8 P.3d 1089. It held that "the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." *Id.* at 355, 100 Cal. Rptr.2d 352, 8 P.3d 1089 (citations omitted).

■ Similarly, to state a "prima facie case of retaliation, a plaintiff must show that: (1)[ ]he was engaging in a protected activity, (2) the employer subjected [him] to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action." See *Xin Liu,* 347 F.3d at 1143–44; *Flait,* 3 Cal.App.4th at 476, 4 Cal.Rptr.2d 522 ("the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action").

## C. Whether Guyton Failed Timely to Exhaust Administrative Remedies Regarding His FEHA Failure to Promote Claims

■ Guyton alleges that Novo Nordisk discriminated against him because of his age and race, and retaliated against him for protected conduct. In support of these claims, Guyton argues, *inter alia,* that Novo Nordisk's failure to promote him to the position of regional support manager constituted discrimination and retaliation. Novo Nordisk contends it is entitled to summary judgment on Guyton's promotion-based discrimination and retaliation claims because the claims are untimely. Specifically, it contends that because Guyton asserts the claims under California's Fair Employment and Housing Act ("FEHA"), California Government Code § 12900, *et seq,* Guyton was obligated to comply with the administrative exhaustion requirements of that statute.[62] "In order to bring a civil action under FEHA, the aggrieved person must exhaust the administrative remedies provided by law. Exhaustion in this context requires filing a written charge with the Department of Fair Employment and Housing ("DFEH") within one year of the alleged unlawful employment discrimination [or retaliation], and obtaining notice from DFEH of the right to sue." *Rodriguez v. Airborne Express,* 265 F.3d 890, 896 (9th Cir.2001) (citing *Romano v. Rockwell Int'l, Inc.,* 14 Cal.4th 479, 492, 59 Cal.Rptr.2d 20, 926 P.2d 1114 (1996); *Yurick v. Superior Court,* 209 Cal.App.3d 1116, 1121, 257 Cal. Rptr. 665 (1989)). "[I]n the context of the Fair Employment and Housing Act … the failure to exhaust an administrative remedy is a jurisdictional, not a procedural defect,' and thus … the failure to exhaust administrative remedies is a ground for a defense summary judgment." *Martin v.*

---

**62.** Motion at 23–24.

*Lockheed Missiles & Space Co.,* 29 Cal. App.4th 1718, 1724, 35 Cal.Rptr.2d 181 (1994) (quoting *Miller v. United Airlines, Inc.,* 174 Cal.App.3d 878, 890, 220 Cal. Rptr. 684 (1985)); see also *Barnes v. Hershey Co.,* No. C 12–1334, 2012 WL 5412031, *6 (N.D.Cal. Nov. 6, 2012) ("Barnes failed to exhaust his administrative remedies, and Hershey's motion for partial summary judgment on his FEHA claim is GRANTED").

Novo Nordisk argues that Guyton was denied the regional support manager position in July 2012; it is undisputed that Guyton filed his DFEH charge on October 4, 2013.[63] Novo Nordisk contends, as a result, that the promotion-based claims are time-barred as a matter of law, since Guyton filed his charge more than one year after the alleged discrimination and retaliation. Guyton counters that he was not eliminated from consideration for the position until late October 2012.[64] He alleges that although Adkins "suggest[ed]" during the July interview that he would not be hired, Guyton did not know he had not been selected until he was informed in late October 2012 that Orozco would be the new regional support manager.[65]

The court concludes that Novo Nordisk has not shown as a matter of law that Guyton failed to exhaust his administrative remedies respecting the failure to promote claims in a timely fashion. The one year period in which to file a DFEH complaint "begins to run when the administrative remedy accrues, which is the occurrence of the unlawful practice." *Holland v. Union Pac. R. Co.,* 154 Cal.App.4th 940, 945, 65 Cal.Rptr.3d 145 (2007). In this regard, "[t]he California Supreme Court has held

that the FEHA statute of limitations begins to run when an alleged adverse employment action acquires some degree of permanence or finality." *Stewart v. Boeing Co.,* No. CV 12–05621, 2013 WL 6839370, *3 (C.D.Cal. Dec. 23, 2013) (citing *Yanowitz v. L'Oreal USA, Inc.,* 36 Cal.4th 1028, 32 Cal.Rptr.3d 436, 116 P.3d 1123 (2005)).

Here, there is evidence from which a reasonable jury could conclude that the adverse employment action—i.e., the failure to promote Guyton to the regional support manager position—occurred in late October 2012, making his October 4, 2013 administrative complaint timely. Guyton states in his declaration that about five minutes into the July 2012 interview with Adkins, he "was made to feel that [he] was just being allowed to go through [the] process for appearance."[66] Nonetheless, Guyton asserts, he was not told he would not be promoted to the position, and he continued to inquire about it through September 2012.[67] Novo Nordisk contends that Guyton's declaration is inconsistent with his deposition. At the deposition, Guyton testified that Adkins "said that [Guyton] wasn't going to get [the job]" during the interview.[68] At most, however, this deposition testimony implies that Guyton *knew* that he would subsequently be denied the position. Even if the court considers this version of what transpired at the interview, the one year statute of limitations is triggered not by knowledge that an adverse employment action will occur in the future, but by the actual occurrence of the adverse action. See *Romano,* 14 Cal.4th at 493, 59 Cal.Rptr.2d 20,

---

63. SUF, ¶ 81; Response, ¶ 81.

64. Opposition at 22.

65. Guyton Decl., ¶ 52.

66. *Id.,* ¶ 46,

67. *Id.,* ¶ 49.

68. Guyton Depo, 207:24–25.

926 P.2d 1114 ("If the administrative complaint must be filed within one year 'after' the unlawful practice—here, a discharge—'occurred,' then for the purpose of that complaint, the administrative cause of action must accrue and the statute of limitations must run from the time of actual termination. It would not run from the earlier date of notification of discharge, because on that date the unlawful practice (that is, the discharge) had not yet occurred").

■ Because there is evidence that the allegedly discriminatory and retaliatory failure to promote occurred in late October 2012, when Orozco was hired instead of Guyton, the court declines to grant partial summary judgment on Guyton's failure to promote claims in Novo Nordisk's favor on the basis that his DFEH charges was not timely filed. See *Gunther v. Xerox Corp.*, No. 13-cv-04596-HSG, 2015 WL 5769619, *5 (N.D.Cal. Oct. 2, 2015) (agreeing with defendant's argument that failure to promote claims were untimely "because they achieved a degree of permanence as soon as someone else was selected for the position in question"). This conclusion is reinforced by the fact that one of the reasons Guyton believes he was a victim of discrimination is that the position was ultimately awarded to a candidate who was under forty and not African–American. Prior to Orozco's selection in late October 2012, of course, Guyton would not have had this information; his lack of knowledge of facts supporting his discrimination claim in July 2012 further counsels against a finding that the one-year time limit began to run at that time. See *Thompson v. C & H Sugar Co.*, No. 12-cv-00391 NC, 2014 WL 1266804, *4 (N.D.Cal. Mar. 24, 2014) ("This Court has found a denial of a promotion to be a decision that was discrete and permanent when made. But in cases that have found denials of promotion to have perma-

nence, the plaintiff knew or had reason to know that the decision was made based on their status in a protected class, and thus the denial of a promotion was sufficient to trigger an employee's awareness of and duty to assert his ... rights," quoting *Maridon v. Comcast Cable Comm. Mgmt., LLC,* No. C–12–2109 EMC, 2013 WL 1786592, *11 (N.D.Cal. Apr. 25, 2013)).

**D. Whether Triable Issues of Fact Remain Concerning Guyton's Claims that Novo Nordisk Discriminated Against Him on the Basis of Race and Age, and Retaliated Against Him for Protected Conduct**

As noted, "[t]he California Supreme Court has adopted the tripartite burden shifting framework established in *McDonnell Douglas* ... to analyze disparate treatment claims" under FEHA. *Lawler v. Montblanc North Am., LLC,* 704 F.3d 1235, 1242 (9th Cir.2013); see *Guz,* 24 Cal.4th at 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 ("California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination ... based on a theory of disparate treatment"). Under the *McDonnell Douglas* framework, "[t]he plaintiff has the initial burden of establishing a prima facie case of discrimination [or retaliation]. Once a prima facie case is shown, a presumption of discrimination [or retaliation] arises and the burden shifts to the defendant to show that the adverse employment action was taken for a legitimate, nondiscriminatory reason. Stating a legitimate, nondiscriminatory reason negates the presumption of discrimination and shifts the burden back to the plaintiff to demonstrate that the proffered reason is mere pretext for discrimination [or retaliation]." *Lawler,* 704 F.3d at 1242.

In the context of a motion for summary judgment, the moving party has the burden of showing that there are no triable issues of material fact and that it is entitled to judgment as a matter of law. *Dept. of Fair Employment and Housing v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir.2011). To prevail on summary judgment, therefore, Novo Nordisk must either show that Guyton cannot establish one or more elements of a prima facie case, or that there was a legitimate, nondiscriminatory reason for taking the actions it did and Guyton has raised no triable issues concerning pretext.

### 1. Prima Facie Case

■ In general, to establish a prima facie case of discrimination under FEHA, a "plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." *Guz*, 24 Cal.4th at 355, 100 Cal.Rptr.2d 352, 8 P.3d 1089.

To state a "prima facie case of retaliation, a plaintiff must show that: (1)[ ]he was engaging in a protected activity, (2) the employer subjected [him] to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action." See *Xin Liu*, 347 F.3d at 1143–44; *Yanowitz*, 36 Cal.4th at 1042, 32 Cal.Rptr.3d 436, 116 P.3d 1123 ("Past California cases hold that in order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed

between the protected activity and the employer's action"); *Flait*, 3 Cal.App.4th at 476, 4 Cal.Rptr.2d 522 ("the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action").

Guyton alleges that Novo Nordisk discriminated against him because of his race (African–American) and his age (over forty). For purposes of his prima facie case under *McDonnell Douglas*, it is undisputed that he has demonstrated membership in a protected class and satisfied the first prong. See, e.g., *Williams v. Edward Apffels Coffee Co.*, 792 F.2d 1482, 1487 (9th Cir.1986) (noting that an African–American plaintiff over forty years of age alleging discrimination on the basis of race and age was "clearly within a protected group"); *Beale v. GTE California*, 999 F.Supp. 1312, 1322 (C.D.Cal.1996) (noting that plaintiffs had demonstrated their membership in a protected class because they were "over the age of forty").

#### a. Protected Activity

■ Novo Nordisk argues that Guyton cannot make out a prima facie case of retaliation because it is undisputed that he did not engage in any protected activity.[69] The court disagrees. FEHA prohibits retaliation against an employee because he "has opposed any practices forbidden under [FEHA] or because [he] has filed a complaint, testified, or assisted in any proceeding [relating to a FEHA claim]." CAL. GOV'T CODE § 12940(h). To qualify as protected conduct, complaints to an employer or supervisor must "sufficiently communicate[ ] to [the employer] that [the employee] believe[d] that [the employer's conduct] was discriminatory." *Yanowitz*, 36 Cal.4th

---

**69.** Motion at 21.

1028, 32 Cal.Rptr.3d 436, 116 P.3d 1123. Although an employee "need not file a formal complaint or use magic words," "complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct." *Alcala v. Best Buy Stores,* No. EDCV 11-00798, 2012 WL 6138332, *11 (C.D.Cal. Nov. 7, 2012).

Guyton testified at his deposition that he communicated to his supervisor Sutton that "he felt like she was unfairly treating [him] and treating [him] different than other people in the district."[70] Although Guyton concedes he did not specifically reference his age or race, a reasonable trier of fact could conclude, based on his reference to "unfairness" and "difference," that he was complaining of unlawful discriminatory treatment. See *Yanowitz,* 36 Cal.4th at 1047, 32 Cal.Rptr.3d 436, 116 P.3d 1123 ("The relevant question is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner," quoting *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 560 (D.Kan.1995)); see also *Mathieu v. Norrell Corp.,* 115 Cal.App.4th 1174, 1187, 10 Cal.Rptr.3d 52 (2004) ("[R]esolving all conflicting inferences in favor of Mathieu, as we must, we conclude a triable issue of fact exists as to whether Norrell reasonably understood Mathieu's complaints to raise an issue of sexual harassment and thus constituted 'protected activity' within the meaning of FEHA").

### b. Adverse Employment Action

■ Novo Nordisk next asserts that Guyton has not demonstrated an adverse employment action to the extent that his discrimination and retaliation claims are based on Novo Nordisk's decision not to award him a transfer. An adverse employment action, of course, is a necessary element of both a prima facie case of discrimination and retaliation. Novo Nordisk argues that to the extent based on the transfer decision, the claims fail because the denial of a transfer is not an adverse employment action.[71] To qualify as adverse employment action sufficient to support a FEHA claim, an employer's action must "result in a material change in the terms of ... employment, impair [the] employment in some cognizable manner, or show some other employment injury." *Thomas v. Dep't of Corrections,* 77 Cal. App.4th 507, 511, 91 Cal.Rptr.2d 770 (2000). The alleged detriment suffered by the employee must be "material" and "substantial." *Schaffer v. GTE, Inc.,* 40 Fed. Appx. 552, 555–56 (9th Cir.2002) (Unpub.Disp.); see also *Meraz v. Jo–Ann Stores, Inc.,* No. CV 03–2914 GAF, 2004 WL 882458, *17 (C.D.Cal. Apr. 2, 2004) ("For the adverse employment action to be legally redressable, it must rise to the level of a material adverse action that produces a detrimental and substantial effect").

Novo Nordisk contends that because Guyton has adduced no evidence that a transfer to Downey or West Hollywood would have bestowed a material benefit—such as increased salary or benefits—the denial of the requests cannot constitute adverse employment action. It is undisputed that Guyton's transfer requests "were lateral moves within the company [that] would not have resulted in an increase in pay or rank, or any other bene-

---

**70.** Guyton Depo., 231:4–6.

**71.** Motion at 15.

fit." [72] Some courts have held that the denial of a lateral transfer that has no material benefits associated with it cannot form the basis for an allegation of discrimination or retaliation. See *Kortan v. State of Cal.*, 5 F.Supp.2d 843, 847, 853 (C.D.Cal. 1998) (holding that a denial of a "request for a temporary transfer to the Ventura facility" was not an adverse employment action because it "did not place plaintiff in a worse position, give her additional, fewer[,] or different responsibilities, or result in a loss of salary or benefits"); *Akers v. County of San Diego*, 95 Cal.App.4th 1441, 1457, 116 Cal.Rptr.2d 602 (2002) ("[A] transfer into a comparable position does not meet the definition of an adverse employment action under FEHA").

■ "[T]he inquiry as to whether an employment action is adverse requires a case-by-case determination," however. *Thomas*, 77 Cal.App.4th at 510, 91 Cal. Rptr.2d 770. Furthermore, what constitutes an adverse employment action "must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination [and retaliation] that the FEHA was intended to provide." *Yanowitz*, 36 Cal.4th at 1054, 32 Cal.Rptr.3d 436, 116 P.3d 1123. The court concludes triable issues of fact remain as to whether Novo Nordisk's denial of Guyton's transfer requests constituted adverse employment action. In his email to Canepa, Guyton communicated his belief that transferring to the Downey territory would benefit him "from a business standpoint" because he had previously developed business relationships with physicians and other HCPs in that location.[73] From this, a jury could thus conclude that the transfer might have improved Guyton's ability to make sales and facilitated improved work performance; this in turn could have led to monetary benefits in the future. Denial of the transfer, therefore, could be viewed as a material and substantial detriment. See *Patten v. Grant Joint Un. High Sch. Dist.*, 134 Cal.App.4th 1378, 1389–90, 37 Cal.Rptr.3d 113 (2005) (noting that a "lateral" transfer of a principal to a different school was an adverse employment action because the school to which she was transferred "d[id] not present the kinds of administrative challenges an up-and-coming principal wanting to make her mark would relish"); see also *Yanowitz*, 36 Cal.4th at 1054, 32 Cal.Rptr.3d 436, 116 P.3d 1123 ("[FEHA] protects an employee against unlawful discrimination with respect not only to so-called 'ultimate employment actions' such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career"). Furthermore, Guyton stated in his email that family illnesses had made it difficult for him to make the commute to his current office, and that he would be aided by a transfer to Downey, which was closer to his home.[74] Although likely not sufficient on its own to make denial of the transfer an adverse employment action, this added benefit that it would have bestowed reinforces the court's finding. See *Patten*, 134 Cal.App.4th at 1390, 37 Cal.Rptr.3d 113 (determining that a transfer constituted an adverse employment action and noting that the school to which plaintiff was transferred "was a year-round school that conflicted with [plaintiff]'s family schedule"). For these reasons, the court finds

---

72. SUF, ¶ 72; Response, ¶ 72.

73. Email Exchange.

74. *Id.*

that there are triable issues of fact as to whether Novo Nordisk's denial of Guyton's transfer requests constituted adverse employment action.

### c. Causation

To establish a prima facie case for retaliation, a plaintiff must also adduce evidence that the adverse employment action was a result of his protected activity. Novo Nordisk argues that Guyton has failed to show causation as a matter of law because he "never complained about the purported discriminatory failure to transfer, failure to promote, or any other purported adverse action to Sutton, Tun, [Adkins,] or human resources." It further contends Guyton "has no evidence that any of the alleged discriminatory actors here, namely Sutton, Adkins, or Tun, were ever aware that [Guyton] believed he was suffering discrimination."[75] As noted, Guyton testified at his deposition that he communicated to Sutton "he felt like she was unfairly treating [him] and treating [him] different than other people in the district."[76] As evidence of a lack of causation, Novo Nordisk appears to rely on its belief that this statement by Guyton was not sufficient to put it on notice that he was complaining of discrimination. For reasons already stated, however, the court finds that triable issues of fact remain as to whether Guyton's conversation with Sutton constituted a form of protected activity. Because Guyton states in his declaration that the conversation took place "about a week or two" before he was placed on an action plan,[77] the temporal proximity between the protected activity and the adverse employment action is sufficient to give rise to an inference of causation and satisfy Guyton's burden at the prima facie stage. See San-chez v. California, 90 F.Supp.3d 1036, 1062 (E.D.Cal.2015) (determining that plaintiff met her prima facie burden to show retaliation by showing adverse action taken "shortly ... after" she engaged in protected conduct); Adetuyi v. City and Cnty. of San Francisco, 63 F.Supp.3d 1073, 1089 (N.D.Cal.2014) ("It is easier to find a causal connection when the alleged employment action closely follows the protected conduct").

### d. Qualification or Competence

■ Respecting Guyton's discrimination claims, Novo Nordisk contends that he has not satisfied the second prong of his prima facie case—i.e., that he was qualified for his position at the time of the alleged discrimination. It argues that during much of the relevant time—including the date on which it denied Guyton's request to transfer territories—Guyton "was not in compliance with [its] policies."[78] A mere finding that an employee has violated company policy is insufficient to establish a lack of satisfactory performance as a matter of law. See Diaz v. Eagle Produce Ltd. Partnership, 521 F.3d 1201, 1208 (9th Cir.2008) ("Diaz, Mancilla, and Moreno have each established a triable issue of fact regarding the second element of the prima facie case. Diaz and Mancilla generally performed dependably and without incident. Deficiencies in their performance were relatively minor and infrequent. The issue is closer for Moreno because he damaged Eagle Produce property three times over the course of approximately four years and once violated a company safety rule, but those incidents were also relatively infrequent. Moreover, there is no evidence that Moreno caused any of the damage intentionally or recklessly, and his

75. Motion at 21.

76. Guyton Depo., 231:4–6.

77. Guyton Decl., ¶ 59.

78. Motion at 15.

supervisor generally found him to be dependable"). While it is true that Guyton was consistently tardy in recording calls and expenditures, the court concludes that Novo Nordisk has not demonstrated that these failures were so severe that they prevent him from establishing a prima facie case; this is especially true given the "minimal proof" of satisfactory performance required at the prima facie stage. *Hauprich v. Fireman's Fund Ins. Co.*, No. 13–cv–01609, 2014 WL 3366736, *20 (N.D.Cal. June 26, 2014) ("At the first step of the analysis ... Plaintiff is required to offer only minimal proof that she was qualified for her position"); *Villasenor v. Sears, Roebuck & Co.*, No. CV 09–9147 PSG, 2011 WL 165374, *6 (C.D.Cal. Jan. 18, 2011) (noting "the minimal burden of establishing the second *prima facie* element"); see also *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir.2000) (stating that "the requisite degree of proof necessary to establish a prima facie case ... on summary judgment is minimal," and reversing the district court's finding that plaintiff was not performing satisfactorily). Moreover, because Novo Nordisk's argument regarding Guyton's violations of company policy also serves as its nondiscriminatory rationale for taking adverse employment action at step two, the court finds it more appropriate to analyze the issue in that context. See *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1345 (9th Cir.1981) ("Under some views of the McDonnell Douglas analytical process, the University's articulated reason and supporting evidence might be considered at step one of that process, i.e., in connection with plaintiff's prima facie

showing that she possesses the requisite qualifications for tenure. We think it preferable, however, to consider the University's arguments at steps two and three").[79]

### e. Circumstances Suggesting Discriminatory Motive

 Novo Nordisk also contends that Guyton cannot satisfy the fourth element of his prima facie case of discrmination— that the circumstances surrounding Novo Nordisk's adverse actions suggest a discriminatory motive.[80] This argument, which consists of a single paragraph, appears merely to incorporate Novo Nordisk's contentions regarding its legitimate, nondiscriminatory reasons.[81] "In a summary judgment motion in an employment discrimination case, the employer as the moving party, has the initial burden to present admissible evidence showing *either* that one or more elements of plaintiff's prima facie case is lacking *or* that the adverse action was based upon legitimate, nondiscriminatory factors." *Serri v. Santa Clara Univ.*, 226 Cal.App.4th 830, 861, 172 Cal.Rptr.3d 732 (2014) (quoting *Hicks v. KNTV Television, Inc.*, 160 Cal.App.4th 994, 1003, 73 Cal.Rptr.3d 240 (2008) (emphasis added)). Novo Nordisk clearly asserts that it had a nondiscriminatory (and nonretaliatory) reason for each action it took. See *Guz*, 24 Cal.4th at 380–81, 100 Cal.Rptr.2d 352, 8 P.3d 1089 ("We need not resolve the 'prima facie burden' issue, for an alternative analysis disposes of Guz's cause of action. In its summary judgment motion, Bechtel did not stand mute, relying solely on the premise that Guz failed to demonstrate a prima facie

---

**79.** The Ninth Circuit noted, however, that "[f]rom a practical standpoint, and despite our determination that evidence of the nature here involved should be considered in connection with steps two and three rather than step one, it should make little difference to

the outcome which way the evidence is analyzed." *Lynn*, 656 F.2d at 1345.

**80.** Motion at 16.

**81.** *Id.*

case of age discrimination. As an additional basis for its motion, Bechtel proceeded directly to the second step of the *McDonnell Douglas* formula. Bechtel set forth competent, admissible evidence of its reasons, unrelated to age bias, why it eliminated Guz's work unit, BNI–MI, and thereafter chose persons other than Guz for vacant positions in the unit to which BNI–MI's functions were transferred"). For that reason, the court proceeds to analyze the second and third steps of the *McDonnell Douglas* test.[82]

**2. Whether Novo Nordisk Has Proffered Evidence of a Legitimate, Nondiscriminatory and Nonretaliatory Reason for the Adverse Employment Actions**

The court next addresses whether Novo Nordisk has met its burden under *McDonnell Douglas.* "To meet this burden, 'the defendant must clearly set forth, through the introduction of admissible evi-

dence,' reasons for its employment decision which, if believed by the trier of fact, would support a finding that the employment action was not a result of unlawful discrimination" or retaliation. *Noyes v. Kelly Servs.,* 488 F.3d 1163, 1169 (9th Cir. 2007) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Novo Nordisk argues it had a legitimate, nondiscriminatory and nonretaliatory reason for both sets of adverse employment actions asserted. As for its failure to promote Guyton, it argues and adduces admissible evidence that Guyton "showed up to the interview unprepared and did not demonstrate the requisite job competencies."[83] As for its failure to grant Guyton's transfer requests, Novo Nordisk argues and adduces admissible evidence that granting the request would have violated Novo Nordisk's policy of declining the transfer request of any employee on an action plan or

**82.** Novo Nordisk's intention to rest on the fact that it had legitimate reasons for taking the actions it did and to show that there are no triable issues of fact concerning pretext—and not to demonstrate that Guyton cannot establish the fourth prong of his prima facie case—is reflected in the language used in the section of its brief that argues Guyton cannot make an adequate showing on the fourth prong of his prima facie case. There, it argues that plaintiff has not adduced "substantial evidence" that his race or age played any role in Novo Nordisk's actions. (Motion at 16). "Substantial evidence," however, is the standard of proof that governs whether plaintiff has made an adequate showing of pretext at step three. See *Serri,* 226 Cal.App.4th at 861, 172 Cal.Rptr.3d 732 ("If the employer meets its initial burden, the burden shifts to the employee to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action,'" quoting *Cucuzza v. City of*

*Santa Clara,* 104 Cal.App.4th 1031, 1038, 128 Cal.Rptr.2d 660 (2002)). Novo Nordisk's arguments thus appear to be directed to the second and third steps of the *McDonnell Douglas* test. See *Aragon v. Repub. Silver State Disposal Inc.,* 292 F.3d 654, 659 (9th Cir.2002) ("The district court's analysis seems to conflate the minimal inference needed to establish a prima facie case with the specific, substantial showing Aragon must make at the third stage of the *McDonnell Douglas* inquiry to demonstrate that Republic's reasons for laying him off were pretextual").

**83.** Motion at 19; see also Adkins Decl., ¶ 7 ("During the interview ... I observed that Mr. Guyton did not appear to have a clear understanding of what the RSM [regional support manager] role entails, which is a threshold expectation I have of any candidate. Indeed, far from appearing prepared for the interview and conversant on the nature and expectations of an RSM, Mr. Guyton asked what I considered to be rudimentary questions about the position, which suggested to me that he did not understand the full requirements of the role").

performance improvement plan.[84] This evidence satisfies Novo Nordisk's burden of proffering admissible evidence of a legitimate, nondiscriminatory and nonretaliatory reason for failing to promote Guyton and failing to transfer him. See *Obico v. Mission Creek Sr. Comm.*, No. C 11–03932 JSW, 2013 WL 622937, *6 (N.D.Cal. Feb. 15, 2013) ("Mr. Obico contends that Mercy has not met its burden, because it has not presented admissible evidence in support of its reasons for terminating Mr. Obico. However, Mercy has put forth evidence that it terminated Mr. Obico, because its employees believed he had attempted to steal Mr. Heatley's property and had not been truthful during the investigation. That evidence is admissible and, if believed by the trier of fact, would support a finding that the decision to terminate Mr. Obico was not the result of unlawful discrimination" (emphasis original)); see also *Noyes*, 488 F.3d at 1169 n. 4 (noting that the defendant's burden at this stage is not to convince the trier of fact that the proffered reason was legitimate, but rather "to articulate a legitimate, nondiscriminatory reason for the failure to promote" plaintiff).

### 3. Whether Guyton Has Raised Triable Issues of Fact Concerning Pretext

■ Because Nono Nordisk "satisfied its burden [of] articulat[ing] a nondiscriminatory [and nonretaliatory] reason for its promotion decision [and for its decision not to transfer Guyton], the burden shift[s] back to [Guyton] to come forward with evidence that the proffered reasons were a pretext for discrimination." *Id.* (citing

*McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817). This shift does not place a new burden of production on plaintiff. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir.2003), amended, —— F.3d ——, 2003 WL 21027351 (9th Cir.2003). Rather, "the factfinder may infer 'the ultimate fact of intentional discrimination' [or retaliation] without additional proof once the plaintiff has made out her *prima facie* case if the factfinder rejects the employer's proffered nondiscriminatory reasons as unbelievable." *Id.*

■ "[A] plaintiff can prove pretext in two ways: (1) *indirectly*, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) *directly*, by showing that unlawful discrimination more likely motivated the employer." *Noyes*, 488 F.3d at 1170 (quoting *Chuang*, 225 F.3d at 1127 (emphasis original)); *Guz*, 24 Cal.4th at 363, 100 Cal.Rptr.2d 352, 8 P.3d 1089 ("[I]n an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions"). If plaintiff relies on circumstantial evidence to make this showing, that evidence must be "specific" and "substantial." *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir.2011) (quoting *Godwin*, 150 F.3d at 1221). An employee cannot meet his burden by simply showing that the employer's decision was "wrong, mistaken, or unwise." *Id.* (quoting *Morgan v. Regents of the Univ. of Cal.*, 88 Cal.App.4th

---

**84.** Motion at 19; see also Carr Decl., ¶ 5 ("In or about December of 2012, I had an open field sales employee position in the Downey territory. I was informed by Myo Tun, the Regional Business Director at the time, that Andrew Guyton was interested in the posi-

tion. I was also informed that Mr. Guyton was on an action plan due to administrative performance deficiencies. I immediately advised Mr. Tun that I would not accept a transfer candidate who was on an action plan").

52, 75, 105 Cal.Rptr.2d 652 (2000)). "Rather; the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence ... and hence infer that the employer did not act for the ... non-discriminatory reasons." *Id.* (quoting *Morgan,* 88 Cal. App.4th at 75, 105 Cal.Rptr.2d 652). "All of the evidence [concerning pretext]— whether direct or indirect—is to be considered cumulatively." *Raad,* 323 F.3d at 1194.

Novo Nordisk contends that Guyton cannot raise triable issues of fact concerning pretext.[85] None of the evidence Guyton proffers is direct; it is all circumstantial. Guyton argues that, for various reasons, Novo Nordisk's reasons for both its failure to promote and its failure to transfer were pretextual.[86]

### a. Failure to Promote

▮ As respects the promotion claim, Guyton contends first that Novo Nordisk's asserted nondiscriminatory and nonretaliatory rationale—that Guyton had a poor interview—was pretextual, because both Guyton and another unsuccessful candidate, Christine Maas (also over the age of forty), had "superior qualifications" to Orozco, who was eventually offered the position.[87] "The Ninth Circuit has stated that a plaintiff's superior qualifications standing alone are enough to prove pretext" for purposes of avoiding summary judgment. *Finley v. County of Martin,* No. C–07–5922 EMC, 2009 WL 5062326, *5 (N.D.Cal. 2009) (citing *Raad,* 323 F.3d at 1194). Al-

though the Fifth Circuit requires disparities between candidates to be "so apparent as to virtually jump off the page and slap us in the face" before they will support a finding of pretext, see *Odom v. Frank,* 3 F.3d 839, 847 (5th Cir.1993), the Ninth Circuit has not adopted such a restrictive approach. *Raad,* 323 F.3d at 1194 (noting that the Ninth Circuit "ha[s] *never* followed the Fifth Circuit" in this "regard" (emphasis original)). Nonetheless, there must be at least a "pronounced difference" between plaintiff's and the successful candidate's qualifications "in order for a plaintiff to survive summary judgment." *Finley,* 2009 WL 5062326 at *5 (citing *Raad* ).

The evidence Guyton offers as proof that he and Maas had qualifications superior to Orozco's is solely in the form of his declaration. There, Guyton states that Orozco holds a Bachelors of Science degree from California Polytechnic State University, and that his degree is in "Animal Science Business Management/International Marketing."[88] He also states that Maas has a Bachelors of Arts in Business Administration and a Masters Degree in Healthcare Administration, although he does not identify the institution from which she received either degree. Guyton does not state how he possesses this information. Guyton asserts that he has a Master's Degree in Business Administration from the University of Southern California.[89] Presented with only this evidence, the court cannot conclude that there is a "pronounced" difference between the candidates such that offering to Orozco and not to Guyton or Maas raises an inference of pretext.

---

**85.** Motion at 19.

**86.** Opposition at 23.

**87.** *Id.* at 19 ("When Mr. Guyton sought promotion to Regional Support Manager in July 2012, both he and another person who were

of superior qualifications were denied the job of [regional support manager]").

**88.** Guyton Decl., ¶ 53.

**89.** *Id.*

First, the fact that Orozco has only a Bachelor's degree, while Guyton and Masa have Master's degrees is not particularly probative, given that there is no evidence Novo Nordisk considered educational background an important or even relevant factor in selecting a regional support manager. See *Finley*, 2009 WL 5062326 at *6 ("Mr. Finley argues that there is also a pronounced difference in qualifications because he, unlike Ms. Grant, has a bachelor's degree.... The Court notes that Mr. Finley has produced no evidence that the decisionmakers in fact believed that a bachelor's degree was required. At bottom, to establish pretext, Mr. Finley would have to demonstrate a discriminatory motive. If the decisionmakers held an honest, good faith belief that a degree was not a prerequisite, even if legally or factually mistaken, such an error would not establish or imply a discriminatory motive.... Accordingly, for the reasons stated above, Mr. Finley has failed to create a genuine dispute of material fact on pretext based on the issue of qualifications").

When looking to the qualifications which—according to undisputed evidence—were actually considered important, Guyton has failed to adduce any evidence of pretext. Adkins, who was solely responsible for the promotion decision, indicated that the principal qualifications for the position were knowledge of the job duties and ability to offer specific examples as to how the candidate would carry out the job duties. He also indicated that the position required competency in quantitative analytics. Adkins states that he did not hire Guyton because Guyton asked "rudimentary questions" which suggested that he did not understand the requirements of the position.[90] He further stated that the only examples Guyton provided reflected his level of competence as a sales representative, and did not explain how those competencies would translate to the more analytic position of regional support manager.[91] Guyton proffers no evidence that he did not ask rudimentary questions at the beginning of the interview; in fact, in his deposition he states that he *did* ask questions that would likely be considered rudimentary. He testified:

Q: So let's go back to the interview. Did you ask any questions in the interview?

A: Yes.

Q: Okay. What was—Do you recall what the first questions you asked Mr. Adkins were?

A: I don't remember the exact questions. I just said, you know, what are you looking for, what makes you qualified for this position, what would make someone successful, those types of questions.[92]

This testimony corroborates Adkins' feeling that "the meeting had shifted from a job interview to an informational interview."[93] Moreover, Guyton has adduced no evidence that he discussed any of his analytic skills, or any non-sales related skills, during the interview; at his deposition, in fact, he admitted that he focused principally on his sales experience.[94] It

90. Adkins Decl., ¶ 7.

91. *Id.*

92. Guyton Depo. at 208:12–20.

93. Adkins Decl., ¶ 7.

94. Guyton Depo. at 199:22–200:7 ("Q: So there's some competencies—you're talking about your competencies as to your job as a sales representative? Guyton: Yes. Q: Okay. So I see. So you were focused on your core competencies as a sales representative. Guyton: Yes. Q: ... You read Mr. McGregor's e-mail [discussing the job interview as requesting that you] be able to give two or three specific examples around each of your sales

might well be the case—although Guyton has offered no concrete evidence to this effect—that Guyton did possess analytic skills; he has adduced no evidence, however, that he communicated this fact to Adkins, who was the individual making the promotion decision. As noted, the relevant question is not whether the employer's decision was erroneous, but rather whether it was discriminatory or retaliatory. See *Serri*, 226 Cal.App.4th at 863, 172 Cal.Rptr.3d 732 ("The employee cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent," quoting *Hersant v. Dept. of Social Servs.*, 57 Cal.App.4th 997, 1005, 67 Cal.Rptr.2d 483 (1997)); *Obico*, 2013 WL 622937 at *6 ("[A]lthough Mr. Obico strongly denies Mercy's version of events, that is not the proper focus. 'It is not important whether [Mercy's reasons] were *objectively* false. . . . Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless," quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (emphasis and alterations original)).

Guyton counters that Novo Nordisk's analytics-experience versus sales-experience explanation of the promotion decision is pretextual. Specifically, he argues that Orozco "also relied on his sales experience; that reliance was embraced by the company." [95] Evidence that Novo Nordisk viewed a particular interview strategy as a positive for an under-forty non-African-American candidate—while viewing it as a negative for Guyton—could indeed be evidence that the claimed nondiscriminatory,

nonretaliatory rationale was pretextual. The argument Guyton makes, however, is not supported by facts in the record. For the proposition that Novo Nordisk "embraced" Orozco's reference to his sales experience, Guyton cites Adkins' declaration. The relevant portion of that declaration states:

> "The other candidate, whom I ultimately hired for the RSM role, self-identified as Hispanic and was also under the age of 40. As a threshold matter, this candidate demonstrated a high level of knowledge about the requirements of the RSM role. Critically, he also impressed me with specific concrete examples of how he had applied his analytic skills to drive sales both in his territory as well as in collaboration with his partners in other territories. It was clear to me that, not only did this candidate possess the advanced analytical skills needed to identify trends, but he was also able to interpret those trends and devise creative solutions and planning to drive sales, which was critical to the success of an RSM." [96]

Read in context, the evidence Guyton cites does not demonstrate that Adkins was impressed with or relied on Orozco's sales experience qua sales experience; rather, Adkins states he was impressed with the way in which Orozco referenced his use of analytic skills and data interpretation to increase sales in his territory. As a result, the purported "inconsistency" identified by Guyton does not raise triable issues concerning the fact that Novo Nordisk's desire to hire an analytics-focused regional support manager was a pretext for discrimination or retaliation. See *Guz*, 24 Cal.4th at 363, 366, 100 Cal.Rptr.2d 352,

---

representative competencies. Guyton: That's right").

**95.** Opposition at 20.

**96.** Adkins Decl., ¶ 10.

8 P.3d 1089 ("The authorities suggest that, in an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions. Here, however, the record contains no direct evidence, and little if any circumstantial support, for such a finding.... In sum, we see no grounds in this record for an inference that Bechtel has materially dissembled in explaining the reasons, unrelated to chronological age, for the personnel decisions leading to Guz's dismissal. Under such circumstances, any independent circumstantial evidence of discrimination is insufficient to raise a rational inference that Bechtel acted on grounds of prohibited bias").

In sum, Guyton has not raised triable issues concerning the fact that Novo Nordisk's reasons for not selecting him to fill the open regional support manager position—i.e., his demonstrated lack of knowledge regarding the position and his failure to provide examples of his analytical skills—were pretextual.[97]

### b. Failure to Transfer

■ Guyton also alleges that Novo Nordisk's denial of his two requests for transfer was discriminatory and retaliatory. Novo Nordisk proffered evidence that the denials were a product of the fact that Guyton was on an "action plan" or "per-formance improvement plan" at the time the transfers were requested, and that its policy prohibits granting transfer requests of employees who are on formal disciplinary plans or are about to be placed on formal disciplinary plans. The burden thus shifts back to Guyton to raise a triable issue of fact that this rationale was pretextual. *Noyes,* 488 F.3d at 1169 ("Once Kelly Services satisfied its burden to articulate a nondiscriminatory reason for its ... decision, the burden shifted back to Noyes to come forward with evidence that the proffered reasons were a pretext for discrimination").

Rodney Carr was the Novo Nordisk manager who ultimately denied Guyton's December 2012 request to transfer to the Downey territory and his May 2013 request to transfer to the West Hollywood territory.[98] Guyton does not appear to dispute that Carr's actual reason for denying the transfer requests was that he was on an action plan in December 2012, and was about to be placed on a performance improvement plan in May 2013. One of Novo Nordisk's proposed uncontroverted facts is that "Carr declined Plaintiff's December 2012 transfer request because he was not comfortable and would not like to transfer a representative who [was] currently on an action plan into his open territory." Guyton's statement of genuine issues noted that this was "undisputed."[99]

---

97. At the hearing, Guyton's counsel appeared to assert that the real reason he was not selected was the fact that neither Adkins nor Sutton had "developed" him, and were not familiar with whether he had the skills necessary to fill the new position. Were this true, it would not raise triable issues regarding pretext, as lack of familiarity with a candidate's skills is a nondiscriminatory, nonretaliatory basis for an employment decision. See *Loggins v. Kaiser Permanente Intern.,* 151 Cal. App.4th 1102, 1111 n. 7, 60 Cal.Rptr.3d 45 (2007) ("[A]n employer is not liable for an employment termination premised on an un-wise or incorrect basis, but only if the employment termination was based on a prohibited reason. To require the employer to go beyond showing a legitimate reason, by requiring the employer to show the termination was 'fair,' would imply that an unfair but otherwise nondiscriminatory employment termination would be actionable. That is not the law").

98. SUF, ¶¶ 68, 71; Response, ¶¶ 68, 71.

99. Response, ¶ 68.

Likewise, Novo Nordisk proposed as uncontroverted the fact that "Carr decided not to move forward with [p]laintiff as a candidate for the May 2013 West Hollywood opening because he understood that [p]laintiff was on or was about to be put on [a] PIP and, therefore, was not eligible to transfer territories." Once again, Guyton stated that the fact was "undisputed."[100] The fact that this was genuinely Carr's reason for denying the transfer requests is further corroborated by an email exchange between Carr and three other managers, in which Carr stated that he was "not comfortable" transferring an employee on an action plan.[101] Guyton has adduced no evidence—either direct or circumstantial—that this rationale was a pretext for discrimination or retaliation; there appears, in fact, to be no evidence in the record that Carr knew Guyton's race or age, or that he was aware of the alleged protected activity.

Rather than argue that the denials *themselves* were based on discrimination or retaliation, Guyton asserts that "Carr's understanding was prejudiced by discrimination and retaliation by Sutton and Tun."[102] Specifically, he argues that he was *placed* on the action plan and performance improvement plan as a result of discrimination and retaliation. Guyton is correct that he can show that a decision was discriminatory or retaliatory through proof that seemingly neutral "criteria [were] inherently discriminatory or discriminatorily applied." *Lynn*, 656 F.2d 1337. Thus, if Guyton were able to raise triable issues concerning the fact that he was disciplined as a result of his race, age or protected conduct, Novo Nordisk would not be able to rely on the discipline as a benign explanation for its failure to transfer, since the rationale would no longer be a "legitimate and nondiscriminatory [or nonretaliatory] reason[ ]." See, e.g., *McGrory v. App. Signal Tech., Inc.*, 212 Cal.App.4th 1510, 1529, 152 Cal.Rptr.3d 154 (2013). In other words, even if the ultimate decisionmaker—Carr—was motivated only by what he believed to be a neutral criterion, the fact that the criterion was applicable only because of discrimination or retaliation would "taint" the decisionmaking process and raise triable issues of fact concerning discrimination and retaliation. See *Noyes*, 488 F.3d at 1171 (reversing a grant of summary judgment for an employer because plaintiff "offered evidence that Jiliesen's selection was tainted by Heinz's [allegedly discriminatory] actions in telling other employees that Noyes was not interested in the promotion"); see also *McGrory*, 212 Cal.App.4th at 1536, 152 Cal. Rptr.3d 154 ("[W]e accept Employee's implicit legal premise that Employer could be liable for Mistry's discriminatory motivation if the male executives who actually terminated Employee were merely the cat's paws of a biased female investigator").

Nonetheless, the court concludes that Guyton has failed to raise triable issues concerning the fact that he was disciplined because he was African–American, over forty, or an employee who had engaged in protected conduct. First, Guyton does not appear to dispute that his placement on an action plan and performance improvement plan was consistent with Novo Nordisk's policy. Compare *Finley*, 2009 WL 5062326 at *7 ("The Ninth Circuit has acknowledged that an employer's deviation from established policy or practice may be evidence of pretext"); see also *Diaz v. Eagle Produce Ltd. Partnership*,

**100.** Response, ¶ 71.

**101.** Email Exchange.

**102.** Response, ¶ 71.

521 F.3d 1201, 1214 (9th Cir.2008) (noting that pretext could be inferred from the fact that the employer deviated from its own policies in making adverse employment decisions); *Brennan v. GTE Gov't Systs. Corp.*, 150 F.3d 21, 29 (1st Cir.1998) ("Deviation from established policy or practice may be evidence of pretext"). It is undisputed that Novo Nordisk's written policies require that DCSs record detailed information about every expenditure made, including the amount and type of expenditure and the names of all individuals present at each meal or other activity related to the expenditure.[103] It is likewise undisputed that Novo Nordisk policy mandates that DCSs enter field sale expenses on a bi-weekly schedule.[104] Finally, it is undisputed that Novo Nordisk policy requires that DCSs log each sales call they make to HCPs immediately after the call is completed.[105] The letter informing Guyton of his placement on an action plan stated that Guyton had violated these policies.[106] Guyton admitted at his deposition that he agreed with the facts underlying his placement on the action plan and did not disagree with the discipline he received:

Q: What did you understand the issue that Novo Nordisk had with respect to your expense reports?

A: Some of them weren't on time.

Q: ... You understood that the action plan had to do with the timely entry of both expenses as well as the syncing of call.

A: Yes.

Q: Okay. Did you disagree with the action plan?

A: No, I didn't. I complied with it and corrected it, and eventually it went away.[107]

Rather than argue that Novo Nordisk deviated from its written policy in disciplining him, Guyton argues that it is appropriate to infer pretext associated with his placement on an action plan—and therefore in the denial of his transfer requests—from other actions taken by Novo Nordisk. Although not clearly articulated, it appears Guyton argues that although his placement on an action plan and performance improvement plan was consistent with written policy, Novo Nordisk often deviated from its written policies and encouraged certain employees to violate those policies and federal regulations.[108] As discussed *infra*, Guyton fails to explain adequately how any evidence of this practice he has adduced gives rise to an inference that he was disciplined as a result of his race, age, or protected conduct.

In his declaration, Guyton asserts that "[f]rom 2011–2013, Management Persons, and specifically Regional Business Director Myo Tun and District Business Manager, Jill Sutton, aggressively directed all of the DCS[s] to be aggressive in spending on and with healthcare professionals to induce them to purchase and/or prescribe [d]efendant's products."[109] He contends that during the same time, Tun and Sutton "regularly directed all of the DCS[s] to 'spend, spend, spend,' and use their budgets, products, samples, promotional materials and whatever it took, to get the healthcare providers to take on ...

103. SUF, ¶ 5; Response, ¶ 5.

104. SUF, ¶ 6; Response, ¶ 6.

105. SUF, ¶¶ 10–11; Response, ¶¶ 10–11.

106. Action Plan.

107. Guyton Depo. at 71:20–72:06.

108. See Opposition at 21.

109. Guyton Decl., ¶ 13,

[d]efendant's products." [110] Guyton does not explain, however, how a reasonable jury could infer from this aggressive sales philosophy that Novo Nordisk permitted or encouraged employees to violate policies regarding the recording of calls and expenditures. A philosophy of "sell, sell, sell" is entirely consistent with a policy of "record, record, record." For that reason, this evidence fails to raise triable issues of fact concerning pretext.

Guyton also contends that pretext can be inferred from the fact that other employees violated company policies and were not disciplined. In essence, Guyton argues that Novo Nordisk's proffered nondiscriminatory and nonretaliatory reason for placing him on an action plan—the fact that he had admittedly violated company policy—is pretextual because it did not place other employees who had violated the policies on action plans. Guyton is therefore attempting "[t]o establish discrimination [and retaliation] based on disparate discipline." *McGrory*, 212 Cal.App.4th at 1535, 152 Cal.Rptr.3d 154. In *McGrory*, the California Court of Appeal stated that in order to create an inference of discrimination or retaliation under this theory, "it must appear 'that the misconduct for which the employer [disciplined] the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly." *Id.* (quoting *Lathem v. Dept. of Children and Youth Servs.*, 172 F.3d 786, 792 (11th Cir.1999)); see *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1113 (9th Cir.2011) ("A plaintiff may raise a triable issue of pretext through comparative evidence that the employer treated younger but otherwise similarly situated employees more favorably than

plaintiff"); *Vasquez*, 349 F.3d at 641 ("A showing that the County treated similarly situated employees outside Vasquez's protected class more favorably would be probative of pretext").

To raise triable issues of fact concerning pretext, Guyton must adduce evidence regarding two types of similarity: (1) similarity between him and the employees who were not disciplined, and (2) similarity between the misconduct he committed and the misconduct of the employees who were not disciplined. *Earl*, 658 F.3d at 1114–15 (addressing both of these questions of similarity).

Guyton identifies two similarly situated employees that he contends were treated more favorably than he was. These are (1) Bryan Okuhara, "an Asian DCS," whose age is not specified, and (2) "Megan Wilson, a much younger employee (in her 20s) DCS," whose race is not specified.[111] As Guyton, Okuhara, and Wilson are all DCSs, they are similarly situated in the company, with the result that a comparison of the treatment they received is appropriate. See *Vasquez*, 349 F.3d at 641 ("[I]ndividuals are similarly situated where they have similar jobs"); *Earl*, 658 F.3d at 1114 ("Earl and all of the other employees described above were Nielson recruiters and thus had to follow the same policies and procedures").

Guyton has not, however, adduced evidence that the conduct in which Okuhara and Wilson engaged was similar to Guyton's repeated failures to log sales calls and record expenditures. *Vasquez*, 349 F.3d at 641 ("Although Vasquez and Ng held the same level position ... Ng did not

---

110. *Id.*, ¶ 16.

111. *Id.*, ¶ 21, 23, 34. Guyton's opposition to the motion states that Wilson is Caucasian,

but cites no evidence for this fact. (Opposition at 21).

engage in problematic conduct of comparable seriousness to that of Vasquez").

As regards Okuhara, Guyton has adduced no evidence that he violated any company policy, much less that his violations were as serious as Guyton's. Guyton contends that Okuhara used his expense budget to patronize a physician's restaurant in order to encourage the physician to purchase Novo Nordisk's products.[112] This appears to be consistent with Novo Nordisk's stated policy of permitting its DCSs to expend funds for the benefit of HCPs while attempting to sell products to the HCPs; Guyton acknowledges such a policy exists.[113] As for Wilson, Guyton has proffered evidence that she engaged in misconduct; he states, in his declaration, that she had "a history of falsifying records."[114] As support for this assertion, however, Guyton cites only one incident. He states that in late 2011, a manager asked Wilson why she had immediately distributed all of her promotional products to HCPs. Wilson said that although she had recorded the distribution immediately, she had in fact distributed smaller quantities of the samples over the following weeks.[115] Wilson was directed not to engage in this recording practice in the future.[116] Guyton adduces no evidence that Wilson did not follow this directive, or that she engaged in questionable recording practices thereafter. The court concludes that no reasonable jury could find that Guyton's repeated violations of Novo Nordisk's policies—including undisputed evidence of at least 215 sales calls and at least forty-seven expenditures he failed to record in a timely fashion—is "comparable" in "seriousness" to Wilson's one-time mistake of recording the distribution of all samples upon her receipt of them, instead of at the time she actually distributed them to HCPs. *Earl*, 658 F.3d at 1115; see also *Obico*, 2013 WL 622937 at *7 (distinguishing *Earl*, and stating that "[i]n the *Earl* case, the Plaintiff presented evidence that she had been fired after a single disciplinary infraction, whereas younger employees, who had similar positions to the plaintiff ... and who committed similar infractions were treated more favorably"); *McGrory*, 212 Cal. App.4th at 1535–36, 152 Cal.Rptr.3d 154 (awarding summary judgment to the employer after noting that "Mistry [a representative of the company] concluded that [the employees] engaged in some different conduct. While Oliver and Employee both told inappropriate jokes, Mistry recommended only that Oliver be given a written warning for making intentional misrepresentations in the investigation. 'Different types and degrees of conduct may warrant different types and degrees of discipline,'" quoting *Burke–Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1325 (11th Cir.2006)).[117]

This is especially true as the evidence demonstrates that Guyton knew his conduct—or at least his later violations—violated company policy, while Wilson appears to have believed that her one-time recording of samples distribution was acceptable.[118] In sum, the court concludes

112. *Id.*, ¶ 21.

113. Response, ¶ 1.

114. Guyton Decl., ¶ 37.

115. *Id.*, ¶ 35.

116. *Id.*, ¶ 34.

117. The assertion by Guyton's counsel at the hearing that the two infractions were similar because both involved "something about logging" is unavailing.

118. See Action Plan; see also Guyton Depo. at 90 (discussing Guyton's knowledge of the policy).

that Guyton's reference to the treatment received by Okuhara and Wilson—absent any other direct or circumstantial evidence of pretext—does not give rise to an inference of discrimination or retaliation. Certainly, it cannot be said to constitute the "specific and substantial" evidence necessary to rebut Novo Nordisk's proffered nondiscriminatory, nonretaliatory reason for disciplining Guyton and later denying his transfer requests. See *Aragon,* 292 F.3d at 664 (affirming a grant of summary judgment for an employer because plaintiff "ha[d] not presented the substantial and specific evidence required to demonstrate that Republic's reasons for the lay off were a pretext for racial discrimination").

At the hearing, Guyton's attorney repeatedly cited a portion of his mid-year review, which appears to have been completed and signed by Guyton and Sutton on August 22, 2012.[119] Counsel emphasized that the mid-year review "talk[ed] glowingly about [Guyton] and his performance," stated that plaintiff "was doing a great job," and reported that his performance was "outstanding." The portions of the performance review in the record do not reference problems logging calls or recording expenditures. Counsel asserted that because some of the policy violations identified by Novo Nordisk occurred before August 2012, the fact that Guyton received a positive review after those violations, and that the review made no mention of them, belied Novo Nordisk's nondiscriminatory and nonretaliatory explanation of the discipline imposed and raised triable issues of fact regarding

pretext. The court first notes that counsel's conclusion that the evaluation was "great" or "outstanding" is contradicted by a review of the document itself. The evaluation was, in fact, far more neutral. While the review noted certain strengths and positive achievements—such as helping the company develop a business relationship with a challenging customer and assisting with the rollout of a new product[120]—it also identified certain areas for potential growth, including "uncover[ing] the needs of h[is] customers" and better understanding and addressing physicians' asserted reasons for not using Novo Nordisk's products.[121]

The mere existence of a positive performance review, moreover, does not raise triable issues concerning the fact that a performance-based nondiscriminatory and nonretaliatory reason for adverse employment action is pretextual. See *Pottenger v. Potlatch Corp.,* 329 F.3d 740, 746 (9th Cir.2003) (holding that "positive comments in [plaintiff's] performance review" did not create a genuine dispute as to pretext); see also *Massucco v. Group Health Co-op.,* 255 Fed.Appx. 129, 132 (9th Cir.2007) (Unpub.Disp.) ("Massucco points to his past positive performance reviews and the fact that other employees at Group Health were not terminated for insubordination toward management. We are satisfied that this evidence is insufficient to create a jury question as to pretext"); *Gibbs v. Kaplan College,* No. 1:14–cv–239–LJO, 2015 WL 1622181, *21–22 (E.D.Cal. Apr. 10, 2015) (awarding summary judgment to

---

119. Opposition, Exh. 16 ("Performance Review").

120. *Id.*

121. *Id.* Though it is not ultimately crucial to the decision, the court also notes that it appears the exhibit submitted by plaintiff is incomplete, as it appears that more was written

with respect to certain portions of the performance review than is visible. It is therefore not entirely clear that the performance review does not allude to failures to log calls and expenditures. Nonetheless, for purposes of this order, the court assumes the omitted portions are immaterial.

defendant and stating that "[p]laintiff received positive performance reviews before and after he complained of sexual harassment in 2011.... That Plaintiff's performance was satisfactory at times and in some respects is not dispositive").

Facts particular to this case preclude inferring pretext from Guyton's mid-year review. First, the positive portions of the review make reference only to Guyton's strengths as a sales representative, including his knowledge of the company's products and his ability to deal with difficult customers.[122] Were Novo Nordisk's proffered nondiscriminatory and nonretaliatory rationale Guyton's ineptitude as a salesperson, the performance review might well give rise to an inference of pretext. Evidence that Guyton was a skilled salesperson does not in any way rebut the assertion that Guyton was disciplined for failing to comply with administrative procedures, however. See *Pottenger*, 329 F.3d at 746 ("Potlatch's proffered explanation does not state that Pottenger was incompetent or a generally bad employee; rather, it states that Potlatch lacked confidence that Pottenger could help turn the company around. Instead of casting doubt on Potlatch's explanation, the statements in the performance review are consistent with it.... Pottenger has pointed to no evidence suggesting that Potlatch has ever offered a reason for his dismissal other than doubt about his commitment to making hard decisions to help the company").

Second, any "inconsistency" between the performance review and the later discipline is explained to some degree by the fact that Sutton prepared Guyton's review,[123] while Caneva placed Guyton on the initial action plan while Sutton was on maternity leave.[124] Although Guyton may have violated company policy prior to August, Sutton may well have been willing to overlook those deficiencies, while Caneva was not so forgiving. Absent evidence, anecdotal or otherwise, that Caneva failed to discipline non-African-American or younger employees who committed similar infractions, a factfinder could not infer discrimination on her part simply because her predecessor did not formally discipline Guyton.

Third and perhaps most importantly, although Guyton's compliance with policy was imperfect in early 2012, it substantially worsened during the second half of that year. Defendant adduced evidence that during the first half of 2012, Guyton failed approximately 45 times to enter expenditures in a timely fashion.[125] Between July and November 19, 2012—the date Guyton was placed on an action plan—the evidence shows that there were more than 145 instances of late logging;[126] in the two-and-a-half months preceding Guyton's placement on a performance improvement plan in May 2013, there were an additional 75 instances of late logging.[127] Thus, although Guyton's counsel suggested at the hearing that his violations were constant and consistent (such that Novo Nordisk's response was inconsistent), the undisputed evidence shows that Guyton's performance worsened in the second half of 2012. Consequently, the August 2012 performance review does not show that the company's reasons for placing Guyton on an action plan and performance improvement plan were pretextual. Rather, they appear to

---

122. Performance Review.

123. *Id.*

124. Guyton Decl., ¶ 59; Caneva Decl., ¶ 6.

125. SUF, ¶¶ 26, 27; Response, ¶¶ 26, 27,

126. SUF, ¶¶ 22, 23, 28; Response, ¶¶ 22, 23, 28.

127. SUF, ¶ 24; Response, ¶ 24.

have been precisely what the company contends—a response to significant deterioration in Guyton's compliance with administrative requirements. See *Gibbs*, 2015 WL 1622181 at \*21 (stating that plaintiffs' evidence of positive reviews "d[id] not undermine Kaplan's assertion that Plaintiff's multiple superiors believed that Plaintiff's overall performance degraded, became unsatisfactory in early 2013, and remained unsatisfactory through his termination in December 2013"); cf. *Massucco*, 255 Fed. Appx. at 132 ("Massucco's past performance reviews are similarly unconvincing, as they were completed *before* [the misconduct on which the adverse employment action was based]" (emphasis original)).

For these reasons, Guyton has failed to show that triable issues of fact remain as to whether the decision to deny his transfer requests was discriminatory or retaliatory.

### 4. Conclusion Regarding FEHA Claims

For the reasons stated, Guyton raised triable issues of fact with respect both to his prima facie case of discrimination and his prima facie case of retaliation. Novo Nordisk adduced evidence that it had non-discriminatory, nonretaliatory reasons for each of the alleged discriminatory and retaliatory acts. Because Guyton failed to adduce evidence raising triable issues concerning the fact that Novo Nordisk's asserted reasons were pretextual—or any other evidence that would support a finding of discrimination or retaliation—the court concludes that Novo Nordisk has satisfied its burden of showing that no triable issues of fact remain and that it is entitled to judgment on the FEHA claims as a matter of law.

128. Motion at 21.

### E. Whether There are Triable Issues of Fact With Respect to Guyton's Wrongful Termination Claim

California law recognizes a claim for wrongful termination in violation of a public policy reflected in a statute or constitutional provision. *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 172, 164 Cal. Rptr. 839, 610 P.2d 1330 (1980) ("In a series of cases arising out of a variety of factual settings in which a discharge clearly violated an express statutory objective or undermined a firmly established principle of public policy, courts have recognized that an employer's traditional broad authority to discharge an at-will employee 'may be limited by statute ... or by considerations of public policy'" (citations omitted)); see also *Kelly v. Methodist Hospital of Southern California*, 22 Cal.4th 1108, 1112, 95 Cal.Rptr.2d 514, 997 P.2d 1169 (2000) ("Tameny claims permit wrongful termination damages when a termination is undertaken in violation of a fundamental, substantial and well-established public policy of state law grounded in a statute or constitutional provision"); *Gantt v. Sentry Insurance*, 1 Cal.4th 1083, 1094–95, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992) (same), disapproved on other grounds in *Green v. Ralee Engineering Co.*, 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046 (1998).

Novo Nordisk argues that the wrongful termination claim fails as a matter of law because Guyton was neither discharged nor terminated.[128] Guyton concedes that he resigned and was not fired; he argues, however, that he was constructively discharged. "In order to establish a constructive discharge, the employee must show: (1) the actions and conditions that caused the employee to resign were violative of public policy; (2) these actions and

conditions were so intolerable or aggravated at the time of the employee's resignation that a reasonable person in the employee's position would have resigned; and (3) facts and circumstances showing that the employer had actual or constructive knowledge of the intolerable actions and conditions and of their impact on the employee and could have remedied the situation." *Valdez v. City of Los Angeles,* 231 Cal.App.3d 1043, 1055, 282 Cal.Rptr. 726 (1991) (quoting *Brady v. Elixir Indus.,* 196 Cal.App.3d 1299, 1306, 242 Cal.Rptr. 324 (1987)). "[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks v. City of San Mateo,* 229 F.3d 917, 930 (9th Cir.2000) (quoting *Turner v. Anheuser–Busch, Inc.,* 7 Cal.4th 1238, 1246, 32 Cal.Rptr.2d 223, 876 P.2d 1022 (2000)).

▮ "Whether conditions were so intolerable as to justify a reasonable employee's decision to resign is normally a question of fact." Nonetheless, situations exist in which an "employee's decision to resign is unreasonable as a matter of law." *Valdez,* 231 Cal.App.3d at 1056, 282 Cal. Rptr. 726. Guyton testified at his deposition that he resigned from Novo Nordisk because management "ma[de] it very clear that ... [he] wasn't going to be a valued employee going forward with the company." [129] As evidence of this, Guyton relies on the same factors that he asserts constituted discrimination and retaliation, i.e. the failure to promote, the denial of transfer requests, and placement on an action

plan and performance improvement plan.[130] Failing to promote an employee or giving an employee a negative evaluation cannot constitute constructive discharge. *Casenas v. Fujisawa USA, Inc.,* 58 Cal.App.4th 101, 115, 67 Cal.Rptr.2d 827 (1997) ("Little discussion is needed regarding Casenas's allegations [that] she received an unfair performance evaluation and was not considered for promotion to a management position. As a matter of law, such events do not create intolerable working conditions transforming a voluntary resignation into constructive discharge"); *Valdez,* 231 Cal.App.3d at 1056, 282 Cal.Rptr. 726 ("[T]he mere failure to promote the plaintiff, even if unlawfully discriminatory, will not support a finding of constructive discharge"). Furthermore, the involuntary transfer of an employee to a position with lower pay does not constitute constructive discharge as a matter of law. *Wagner v. Sanders Assoc., Inc.,* 638 F.Supp. 742, 745 (C.D.Cal.1986); see also *King v. AC & R Advertising,* 65 F.3d 764, 768 (9th Cir.1995) ("[A] demotion in job level, even when accompanied by reduction in pay, does not constitute a constructive discharge"). A priori, the denial of a transfer to a lateral position with no pay increase cannot constitute constructive discharge.

The court notes additionally that Guyton conceded at his deposition that the actions he contends constituted constructive discharge occurred primarily before his leave of absence; he did not resign for approximately six months later, and only after he had secured another job.[131] The fact that Guyton did not immediately resign after experiencing the actions he contends were "extraordinary and egregious" further sup-

---

**129.** Guyton Depo. at 16:12–16.

**130.** Opposition at 25.

**131.** Guyton Depo. at 19:10–14; see also SUF, ¶ 77; Response, ¶ 77.

ports the court's conclusion that Guyton was not discharged as a matter of law. *Champlain v. City of Folsom*, No. CIV 032018 FCD, 2005 WL 3299520, *5 (E.D.Cal. Dec. 6, 2005) ("Plaintiff appears to have taken his time, weighed his options for employment, and only after he secured another job did he resign from his employment with defendant. Defendant is entitled to summary judgment on this claim because a reasonable jury could not find that plaintiff resigned because of the alleged intolerable conditions"); *Wagner*, 638 F.Supp. at 745 ("The undisputed fact that [plaintiff] remained in his new position for several months before resigning goes a long way toward destroying his assertion that the transfer created an intolerable situation. This Court must therefore conclude that on facts which are not in genuine dispute, Wagner was not constructively discharged and cannot state any claim for constructive discharge").[132]

 Even if Guyton were able to establish that he was constructively discharged, moreover, his wrongful discharge claim would still fail as a matter of law. "An employer may not discharge an at will employee for a reason that violates fundamental public policy." *Stevenson v. Superior Court of Los Angeles County*, 16 Cal.4th 880, 887, 66 Cal.Rptr.2d 888, 941 P.2d 1157 (1997). The claimed public policy, however, must be "tethered to" a specific constitutional or statutory provision. *Green v. Ralee Engineering Co.*, 19 Cal.4th 66, 76, 78 Cal.Rptr.2d 16, 960 P.2d 1046 (1998). Claims of wrongful termination in violation of public policy generally fall into one of four categories: the employee was terminated because (1) he refused to violate a statute; (2) he performed a statutory obligation; (3) he exercised a constitutional or statutory right or privilege; or (4) he reported a statutory violation for the public's benefit. See *id.*

Guyton alleges that his wrongful discharge claim is "based upon discrimination."[133] Because his wrongful termination claim is based on purported discrimination violating FEHA, it fails for the same reasons his FEHA claims fail. Additionally, because Guyton's retaliation claim fails as a matter of law, he cannot establish that he was wrongfully discharged because he "exercised a statutory right" or "reported a statutory violation for the public's benefit." See *Carter v. RBC Capital Markets Corp.*, No. 2:09–CV–06252–R–AGR, 2010 WL 1994879, *4 (C.D.Cal. May 18, 2010) ("Plaintiff's Third Claim for Wrongful Termination in Violation of Public Policy fails because it is duplicative of the other claims. This claim is derivative [of] her discrimination and retaliation claims and, therefore, fails in conjunction with those claims").

For both of these reasons, the court grants Novo Nordisk's motion for sum-

---

**132.** At the hearing, Guyton's counsel attempted to rebut the suggestion that he took a leave of absence solely for the purpose of locating a new job. He asserted that Guyton maintained contact with Novo Nordisk while on leave because he hoped that it would reconsider its transfer and/or promotion decisions. Even were it the case that Guyton took a leave of absence in good faith, this does not change the fact that (1) he did not resign for six months following the actions he now claims constituted a constructive discharge

and (2) he resigned immediately after securing a new job. Coupled with the fact that the transfer/promotion decisions were not the type of intolerable or aggravated conditions that will support a finding of constructive discharge, these facts preclude a reasonable factfinder from concluding that Guyton was constructively discharged.

**133.** Opposition at 24.

1092

mary judgment on the wrongful discharge claim.

## III. CONCLUSION

For the reasons stated, the court grants Novo Nordisk's motion for summary judgment.